# Illinois Official Reports

## Appellate Court

---

### *People v. Foreman*, 2019 IL App (3d) 160334

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY DEWAYNE FOREMAN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0334 |
| Filed | April 5, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 12-CF-911; the Hon. David A. Brown, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part.<br>Cause remanded. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Bryon Kohut, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jerry Brady, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Holdridge and O'Brien concurred in the judgment and opinion. |

¶ 1        After a jury trial, defendant, Timothy Dewayne Foreman, was convicted of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2012)) and was sentenced to 9½ years in prison. Defendant appeals his conviction and sentence, arguing that the trial court erred in (1) admitting certain other-crimes evidence at defendant's trial and (2) sentencing defendant as a Class X offender. We affirm defendant's conviction, vacate his sentence, and remand this case for a new sentencing hearing.

¶ 2                                    I. BACKGROUND

¶ 3        In August 2012, defendant was arrested and charged with two drug offenses—unlawful possession of a controlled substance with intent to deliver, a Class 1 felony (1 gram or more but less than 15 grams of cocaine), and unlawful possession of a controlled substance, a Class 4 felony (less than 15 grams of cocaine). The charges stemmed from the execution of a search warrant at the residence where defendant and a person named Tinique Henderson were living. During the pretrial stage of the case, the State filed a motion *in limine*, seeking to admit evidence of defendant's prior or subsequent drug offenses as proof of defendant's intent to deliver the substance in the present case, his knowledge and familiarity with controlled substances, his continued course of criminal conduct, and his lack of mistake.[1] The prior or subsequent drug offenses involved were Peoria case Nos. 00-CF-866, 00-CF-949, 08-CF-353,[2] and 13-CF-861.

¶ 4        In its written motion, the State presented a detailed synopsis of the facts of each of the other-crimes cases (other cases). The State represented that in case No. 00-CF-866, defendant was arrested at the Shop Rite store in Peoria for driving while license suspended and was found to have 5 bags of suspected cannabis and 10 bags of suspected cocaine in his coat pocket. The offenses occurred in September 2000. Five of the bags of suspected cocaine were analyzed by a forensic chemist and were found to contain cocaine with a weight of 1.7 grams. The remaining five bags of suspected cocaine were not tested and had a weight of 1.9 grams. The case was eventually dismissed in August 2001 pursuant to defendant's plea of guilty in case No. 00-CF-949. In case No. 00-CF-949, defendant was arrested and convicted of unlawful delivery of a controlled substance after he sold 0.2 grams of cocaine to an undercover police officer. The offense occurred in June 2000. Defendant pled guilty to the offense in August 2001 and was sentenced to three years in prison. In case No. 08-CF-353, defendant was a backseat passenger in a vehicle that had been stopped by police. Upon searching the vehicle, a police officer found 18 bags of suspected cocaine inside a larger bag on the rear passenger floorboard directly below where defendant had been seated. One of the inner bags contained a large amount of suspected cocaine and the remaining 17 inner bags each contained a small amount of suspected cocaine. The offense occurred in March 2008. The bag containing the large amount of suspected cocaine was analyzed by a forensic chemist and was found to

_____

[1]The State actually filed two separate motions *in limine*. For the purpose of simplicity, we will refer to them as a single motion here.

[2]This case is listed as case No. 08-CF-352 at some points in the record and as case No. 08-CF-353 at other points in the record. For the purpose of consistency, we will refer to it as case No. 08-CF-353 throughout our decision in this case.

contain cocaine with a weight of 6.8 grams. The remaining 17 bags containing smaller amounts of suspected cocaine were not tested and had a total gross weight of 6.2 grams (including the packaging). The case was dismissed in July 2008, pursuant to defendant's plea of guilty in case No. 07-CF-661. In case No. 13-CF-861, defendant was arrested on an outstanding warrant and was found to have a bag containing 3.2 grams of cocaine in his pants pocket. The offense occurred in September 2013.

¶ 5    Defendant opposed the State's motion *in limine*, arguing that the prejudicial impact of the other-crimes evidence substantially outweighed its probative value because the other offenses had happened too long ago, did not involve intent to deliver, and/or did not involve criminal charges of which defendant had been convicted.

¶ 6    In May 2015, a hearing was held on the State's motion *in limine*. During the course of the hearing, the trial court listened to the parties' oral arguments and asked the parties numerous questions.[3] The trial court asked the State how it anticipated proving intent to deliver. The prosecutor responded that several of the typical indications of intent to deliver were present in the instant case. The prosecutor told the trial court that two search warrants were issued in the present case, that substances were found in both a residence and a vehicle, that individual packaging was involved, that packaging materials were found in the residence, and that the weight of the substances involved might or might not be indicative of intent to deliver. The trial court asked defendant whether he anticipated contesting the issue of intent to deliver at trial. Defendant responded affirmatively and indicated, when asked, that he did not believe that the quantities of the substances involved in this case or the other facts mentioned were indicative of intent to deliver. The trial court asked the prosecutor what the factual similarity was between the 2013 case and the current case (the prosecutor had already discussed the factual similarity of the other cases), and the prosecutor gave the trial court a brief rendition as to the similarity. During that rendition, the trial court asked the prosecutor additional questions as to whether defendant had been charged or convicted in each of the other cases and how the prosecutor intended to prove the facts of the other cases. The prosecutor indicated that she would present witnesses for those cases that did not result in a conviction and would present certified copies of conviction for those cases that did result in a conviction. The trial court asked defendant if he anticipated raising a defense of mistake or lack of knowledge at his trial, and defendant responded affirmatively.

¶ 7    At the conclusion of the hearing, the trial court granted the State's motion *in limine* in part and denied the State's motion in part, discussing each of the other cases in turn. As for case No. 00-CF-866, the trial court ruled that the State could introduce evidence of the 10 bags of cocaine that were recovered. The trial court stated further, however, "[t]he cannabis I don't think is relevant unless something else were to come up, but they [(the State)] could use that offense, the facts of that circumstance to show intent to deliver." With regard to case No. 08-CF-353, the trial court found that the evidence in that case was consistent with a pattern of having multiple bags or multiple divided amounts of cocaine for distribution or sale. The trial court stated that it would allow evidence of that offense to be admitted for the purpose of proving intent to deliver. The trial court found further, however, that the prejudicial effect of the other two incidents, case Nos. 00-CF-949 and 13-CF-861, substantially outweighed the

_____

[3]Defendant represented himself at some points in this case and was represented by counsel at other times in this case.

probative value, but ruled that if defendant claimed that he had no knowledge of or experience with cocaine, the State would be allowed to introduce evidence from those two incidents to rebut defendant's claim in that regard.

¶ 8        Shortly before the start of defendant's first trial in this case, defendant asked the trial court a question about the State's ability to introduce the other-crimes evidence. A conversation ensued that indicated that the trial court's ruling on the other-crimes evidence may have been broader than initially suggested. The pertinent part of that conversation was as follows:

"THE DEFENDANT: One of the—at the motion hearing she [the prosecutor] wasn't allowed to use the—she was allowed to bring those cases in if I was choosing to use my defense as if I didn't know the knowledge—basis of cocaine. That was the only reason that she would be allowed to bring those cases in is what—

THE COURT: No. At the time of that hearing you indicated that you were contesting everything with regard to the charges including whether the amount was with intent to deliver and whether you had any knowledge of it and the like. And as a result, I said that she could present those, all right?

THE DEFENDANT: You—

THE COURT: That was the ruling. Now leading up to trial you haven't changed your position as far as I know on the record, and as a result, she's preparing for trial appropriately.

I mean if you after the State's case in chief—you know, she can't anticipate your change in trial strategy so she's preparing accordingly.

* * *

THE DEFENDANT: The only thing I'm confused on, [Y]our Honor, is the fact with the situation on the cases for lack of mistake. That's where I'm confused at with the ruling.

Like if I tell the jury I know what crack cocaine is, I—I know what it is, then she's gonna be allowed to use it or is she automatically gonna be allowed to use it? That's what I'm confused on.

THE COURT: Let me ask, Ms. [Prosecutor], what's the—I understand you don't have to disclose your intent necessarily or your trial strategy, but what—what would be the intent of the State with regard to those other bad acts I'll say?

[THE PROSECUTOR]: Your Honor, as the State is required to prove that the defendant knowingly possessed the substance in this case with the intent to deliver, his prior bad acts are admissible to show that he does have a prior knowledge of cocaine, a prior knowledge and prior history with the drug. That it goes to what his intent was when he possessed these drugs based upon what has occurred in the past.

Again, the Court has found that based upon the similarity of the packaging and the amounts of drugs that were in these two particular cases, that they met the standard under Perkins [(*United States v. Perkins*, 548 F.3d 510, 514 (7th Cir. 2008))] so it goes not only to prove intent, but it also goes to show lack of mistake.

That he's been involved with drugs and has quite a history of involvement with drugs and that it's not likely that this is just a mistake.

THE COURT: All right. So—

- 4 -

[THE PROSECUTOR]: It's not whether he knows what cocaine is. It's his involvement with the substance and his continued involvement over a course of time.

THE DEFENDANT: Your Honor, my problem with that is I haven't—I had never had a chance to put on no evidence. I was never proven to be guilty of these drugs or how could they present it that I have a—I don't have a lack of mistake when I was never proven that these your drugs.

THE COURT: You can—you can certainly argue that.

THE DEFENDANT: Okay.

THE COURT: All right. And—and I'd also say, Mr. Foreman, that if—if, in fact, you don't present any claim or defense of lack of knowledge of what cocaine is and something along those lines, then the jury would be instructed that those prior bad acts would be used for purposes only of determining whether you had the intent to deliver."

¶ 9 Defendant's jury trial went forward. For the most part, defendant claimed at the first jury trial that he did not have possession of the substance and that the police had framed him. Ultimately, the jury was unable to reach a verdict, and a mistrial was declared.

¶ 10 After the first trial was completed, the trial court continued the prior rulings on the various pretrial motions to the new trial. Defendant provided notice that he would argue at the second trial that the police had framed him in this case and had planted the drugs on him in case Nos. 00-CF-866 and 08-CF-353. The State filed a motion *in limine*, seeking to admit evidence of the offenses charged in case Nos. 00-CF-949 and 13-CF-861 to rebut defendant's claims that the police planted the drugs on him. The State also indicated that, pursuant to the trial court's earlier ruling, the State would again present evidence regarding the incident that resulted in case No. 00-CF-866. The trial court later held a hearing on, and granted, the State's motion.[4]

¶ 11 Defendant's second jury trial in this case was held in December 2015. The trial took three days to complete. During opening statements, the prosecutor told the jury that the evidence would show that Peoria police officers executed a search warrant at a residence on the date in question, that during the search, the officers recovered cocaine and several other items of evidence that were indicative of drug sales, that defendant's fingerprint was on one of the items recovered, and that the fingerprint of Tinique Henderson (the other adult living at the residence) was on one of the other items recovered. The prosecutor stated further that after all of the evidence had been presented, she would ask the jury to find defendant guilty of unlawful possession of a controlled substance with intent to deliver. Defendant told the jury in opening statement that the evidence would show that he was not present at the residence when the search warrant was executed, that the police had conducted a shoddy investigation, that defendant had been singled out for some reason, that some of the police officers were lying, and that some of the evidence had been fabricated. Defendant also told the jury that the State was going to present evidence of other incidents, of which defendant had not been proven guilty, that had nothing to do with the present case. Finally, defendant told the jury that if he proved his case, he would ask the jury to find him not guilty.

---

[4]Despite the representations that had been made, defendant did not claim at his second trial that the drugs were planted, and the State did not seek to admit the evidence from case Nos. 00-CF-949 and 13-CF-861. The State also did not seek to admit the evidence from case No. 08-CF-353.

¶ 12	After the opening statements had concluded, the trial moved into the evidence phase. Numerous witnesses testified, including several officers who participated in the execution of the search warrant (some of the officers testified in the State's case and some testified in defendant's case), the officer who examined the items recovered for fingerprints, the officer who verified the fingerprints that were found, and the forensic chemist who analyzed some of the items recovered. The testimony of those witnesses established the following. On August 8, 2012, several Peoria police officers executed a search warrant at a residence located at 1015 East Republic Street in Peoria, Illinois, where defendant and Tinique Henderson were living. Henderson was present at the residence at the time. Officers searched the residence and found under the bed in the southwest bedroom a working digital scale, an open box containing a mixture of whole plastic bags and torn-off plastic bags (bags that had both corners torn off), and a plate that had cocaine residue on it. Officers also found in the same bedroom the defendant's state identification card in a cabinet, a douche box containing a possible look-a-like substance, and $700 in bundled currency in a drawer. The currency consisted of thirty-four $20 bills, one $10 bill, and two $5 bills. In a closet that connected both the southwest and northwest bedrooms, the police officers found a bag containing an off-white rocky substance that appeared to be cocaine. The bag was located in the pocket of a toddler's jacket that had been hung up in the closet. The substance found in the jacket was later determined by forensic analysis to contain cocaine and to have a weight of 3.1 grams. An additional amount of currency, $230, was subsequently recovered from defendant's person. The currency consisted of two $50 bills, four $20 bills, four $5 bills, and thirty $1 bills. Defendant's fingerprint was found on one of the torn-off bags, and Tinique Henderson's fingerprint was found on the douche box. A partial fingerprint was found on the plate, and defendant could not be eliminated as the person who had left that fingerprint. A police officer, who testified as an expert in drug sales, opined extensively that the items recovered, including the denominations of currency and the cocaine in the toddler's jacket, were indicative of drug sales, rather than merely drug possession, and explained the reason for his opinion in that regard. Another officer also described during his testimony the relationship between some of the items recovered and the sale of drugs. The cocaine and the other items that were recovered were admitted into evidence, along with the fingerprints and a video recording, which had been played for the jury, showing the collection of the evidence in the residence during the search.

¶ 13	As for the other-crimes evidence, Peoria police detective Steven Garner testified for the State about the incident that gave rise to case No. 00-CF-866. Garner stated that on September 23, 2000, he arrested defendant in the Shop Rite store in Peoria for driving while license suspended. Defendant struggled with Garner as Garner tried to place defendant under arrest. After handcuffing defendant, Garner found in defendant's coat pocket 5 individually wrapped bags of marijuana and 10 individually wrapped bags of cocaine. There were other people present in the store at the time, and defendant shouted out that the marijuana was his but that Garner had placed the crack cocaine on him. Charges were filed regarding the incident, but defendant was never convicted of those charges. Instead, the case was dismissed, based upon an agreement that had been made. There was a video recording of the incident, but the recording had been disposed of after the case was dismissed. According to Garner, the video was consistent with his testimony. The substances that Garner recovered were later analyzed by a forensic chemist. The chemist tested the substance in five of the bags of suspected cocaine and found that the substance contained cocaine with a weight of 1.7 grams. The remaining five

bags of suspected cocaine were not tested and had a total gross weight of 1.9 grams. The chemist also tested the substance in all five bags of the suspected cannabis and found that the substance contained cannabis with a weight of 11.9 grams. At the time of Garner's testimony, defendant declined to have the jury given a limiting instruction as to its consideration of the other-crimes evidence.

¶ 14    During his case-in-chief, defendant called Officer Todd Leach to the witness stand. Leach had not previously been called to testify by the State. Leach was the officer who had actually found the defendant's state identification card in the southwest bedroom and also served as the video officer during the execution of the search warrant. During Leach's testimony, defendant played a portion of the video recording from the search. Although not quite clear from the record, apparently the portion of the video recording that defendant played had not been previously played for the jury. In the portion of the video recording played by defendant, an officer searched a Chevrolet Tahoe at the police station. Prior to that time in the trial, no evidence had been presented regarding the existence or search of the Tahoe or any items recovered from the Tahoe. Defendant pointed out with his questions that the officer searching the vehicle could be seen in the video putting gloves on, even though the officer was already inside the vehicle and the center console compartment was already open. Defendant was apparently trying to advance his claim of a shoddy investigation by suggesting to the jury that the officer had searched the interior of the vehicle without wearing gloves. Defendant also elicited from Leach that the vehicle had been located on North Street and that it had been driven to the police station by a police officer so that a search could be conducted.

¶ 15    On cross-examination, the State elicited from Leach that the Tahoe was searched pursuant to a search warrant, that the vehicle was located on North Street, that defendant was arrested on North Street, that the search of the vehicle took place a few hours after the search of the residence, that defendant had been taken into custody prior to the execution of the search warrant on the vehicle, and that the officer who searched the interior of the vehicle was wearing gloves when he recovered 28 individually wrapped rocks of suspected cocaine from the center console of the vehicle. The State played the remainder of the video recording for the jury. The video recording showed the police recovering 28 individual bags of cocaine from the center console of the Tahoe.

¶ 16    On redirect examination by defendant, Leach testified further that he did not know whether the officer who had searched the vehicle had gloves on prior to doing so, that he did not know who located the vehicle on North Street or who took defendant into custody, and that he did not know what time defendant was taken into custody. Upon being asked where defendant was taken into custody on North Street, Leach responded that it was at the probation office.[5] Leach confirmed that he had never seen defendant driving the Tahoe. When defendant asked Leach where the keys to the Tahoe had come from, Leach responded that the video stated that the keys came from defendant.

¶ 17    Defendant also called Tinique Henderson to the witness stand. Henderson testified that the cocaine found in the residence was hers, that she told the police when the search occurred that the cocaine in the residence was hers for personal use, and that she showed the police where the cocaine was located in the residence. According to Henderson, defendant moved in with

---

[5]Later testimony indicated that defendant was actually taken into custody at the office of his parole officer.

her at the residence in July 2012 because he had no place else to go. Defendant slept on the couch and his belongings were stored in the basement. Defendant did not have a job but said that he could help bring food into the house with his Link card. Henderson had recently received her last work paycheck and kept currency in her bedroom. During the search, the officers found a traffic ticket and asked Henderson about the Tahoe. Henderson told the officers that the car belonged to her ex-boyfriend, Melvin Timothy, and was registered to him. Henderson gave the keys to the Tahoe to the police and showed the police where the vehicle was parked on Nowland Street at the house of the mother of Timothy's child. Some of the cocaine at the residence belonged to Timothy. Henderson never saw defendant in possession of the drugs found in the residence, the two were not in a relationship, and defendant did not own a vehicle or have large sums of money. On the morning of the search, Henderson took defendant to see his parole officer on North Street and dropped him off. The search of the residence took place after Henderson returned. In November 2015, Henderson pled guilty to possession of a controlled substance with intent to deliver relating to the cocaine that was found in the residence during the search.

¶ 18    On cross-examination, Henderson admitted that defendant was the father of Henderson's youngest child. Henderson denied telling the police that there was nothing illegal in the house and also denied telling the police that defendant had taken the Tahoe that morning to see his parole officer. Henderson acknowledged that she had listened to a phone call between her and defendant, in which they discussed the facts of the case, and the State admitted and published a telephone conversation in which defendant told Henderson to "stay low" and that if he was acquitted, he could testify to anything he wanted at her trial.

¶ 19    On redirect examination, Henderson stated that defendant was trying to protect her and that she felt bad because defendant was in jail for something she had done.

¶ 20    Peoria police captain Loren Marion III testified in rebuttal for the State that he and Officer Matthew Lane had interviewed Henderson on the date of the search of the residence. Henderson told the officers that nothing illegal would be found in the house, that nothing illegal in the house was hers, and that defendant had driven the Tahoe that morning to meet his parole officer. Officer Lane located the Tahoe on North Street about one block from the parole office, and defendant was arrested in the parole office. The trial court admonished the jury that the line of questioning was for the purpose of impeachment of Henderson's testimony only.

¶ 21    Peoria police officer Clint Rezac testified in rebuttal for the State that 28 small, knotted bags of crack cocaine were recovered from the center console of the Tahoe. The substance field tested positive and was later analyzed by a forensic chemist. The chemist tested the substance found in 9 of the bags and determined that the substance contained cocaine with a weight of 2.3 grams. The other 19 bags were not tested and had a total gross weight of 4.9 grams. The trial court admonished the jury that the two charges against defendant in the instant case were not for the substance found in the Tahoe and that defendant's involvement in crimes not charged could only be considered by the jury for the limited purpose of showing defendant's intent and/or knowledge.

¶ 22    After the presentation of the evidence had been concluded, the parties gave their closing arguments. During the summation portion of its closing argument, the State did not refer to the other-crimes evidence. Defendant, on the other hand, mentioned the other-crimes evidence several times during the course of his closing argument. In the rebuttal portion of its closing

argument, the State referred to the other-crimes evidence briefly and told the jury the purpose of that evidence was to show defendant's intent to deliver.

¶ 23 After all of the evidence had been presented and closing arguments had been made, the trial court instructed the jury on the law. Among other things, the trial court told the jury, over defendant's objection, that the jury could consider evidence of defendant's other crimes on the issue of defendant's intent or knowledge and that the other-crimes evidence could be considered only for that limited purpose (see Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014)). The jury ultimately found defendant guilty of possession of a controlled substance with intent to deliver. After the trial court entered the verdict, it ordered a presentence investigation report (PSI) and continued the case for a sentencing hearing.

¶ 24 Defendant filed a motion for new trial. In the motion, defendant asserted, among other things, that the trial court erred in allowing the State to present the other-crimes evidence. Following a hearing, the trial court denied the motion.

¶ 25 Defendant's PSI showed that defendant was convicted of, among other things, delivery of a controlled substance in 2000, a Class 2 felony, and driving while license revoked (DWLR) in 2009, a Class 2 felony.[6] The State argued that defendant was subject to mandatory Class X sentencing under section 5-4.5-95(b) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-95(b) (West 2012)), and defendant disagreed. The trial court sentenced defendant to 9½ years in prison as a Class X offender pursuant to section 5-4.5-95(b). Defendant filed a motion to reconsider and argued that the sentence was excessive. The trial court denied the motion to reconsider, and defendant appealed.

¶ 26 II. ANALYSIS

¶ 27 A. Other-Crimes Evidence

¶ 28 As his first point of contention on appeal, defendant argues that the trial court erred in admitting the other-crimes evidence at defendant's trial. Defendant asserts that the other-crimes evidence should not have been admitted because the prejudicial effect of the other-crimes evidence substantially outweighed its probative value. In support of that assertion, defendant contends that (1) the other-crimes evidence lacked probative value because defendant was only contesting at trial whether he possessed the cocaine—not whether the person who possessed the cocaine had the intent to deliver it—and because intent to deliver was already overwhelmingly established without the other-crimes evidence being presented and (2) the admission of the other-crimes evidence was highly prejudicial because it resulted in an improper mini-trial being conducted on the other offenses at defendant's trial, because the State introduced evidence of defendant's other-crimes cannabis possession in violation of the trial court's ruling on the motion *in limine*, because the other-crimes evidence served only to show defendant's propensity to commit drug crimes, and because the trial court incorrectly instructed the jury that it could consider the other-crimes evidence for both intent to deliver

---

[6]Defendant was actually convicted of two DWLR offenses in 2009. Both of the offenses were Class 2 felonies, and both occurred within a short time period in May 2009. Since the second May 2009 DWLR offense could not have been committed after defendant was convicted on the first May 2009 DWLR offense, only one of the offenses could potentially be a qualifying offense under section 5-4.5-95(b) of the Unified Code of Corrections. See 730 ILCS 5/5-4.5-95(b) (West 2012). For the purpose of simplicity, therefore, we will refer only to a single 2009 DWLR conviction.

and knowledge, rather than merely for intent to deliver as the trial court had previously ruled. For all of the reasons stated, defendant asks that we reverse his conviction for unlawful possession of a controlled substance with intent to deliver and that we remand this case for a new trial.

¶ 29 The State argues that the trial court's ruling on the admissibility of the other-crimes evidence was proper and should be upheld. In response to defendant's specific assertions, the State contends that the trial court's ruling was appropriate because (1) the State was required to prove intent to deliver beyond a reasonable doubt as an element of the offense, regardless of defendant's trial strategy, and was required to do so even if defendant was not contesting the proof as to that element of the offense, (2) the State did not violate the trial court's ruling on the motion *in limine* by introducing evidence of defendant's 2000 cannabis possession, (3) the admission of the other-crimes evidence did not result in an improper mini-trial being conducted during defendant's trial, and (4) any resulting prejudice was reduced since the trial court repeatedly instructed the jury that it could consider the other-crimes evidence only for defendant's intent and knowledge to deliver the substance in the instant case. In the alternative, the State contends that any error that occurred in the admission of the other-crimes evidence was harmless. For all of the reasons set forth, the State asks that we affirm defendant's conviction.

¶ 30 A determination of the admissibility of evidence is in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12; *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Under the abuse of discretion standard, the appellate court owes some deference to the trial court's ability to evaluate the evidence's impact on the jury. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003). The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *Donoho*, 204 Ill. 2d at 182. Reasonable minds can disagree about whether certain evidence is admissible without requiring a reversal of a trial court's evidentiary ruling under the abuse of discretion standard. *Donoho*, 204 Ill. 2d at 186.

¶ 31 It is well established under Illinois law that evidence of other crimes is not admissible to show a defendant's propensity or disposition to commit crimes. *Id.* at 170; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Other-crimes evidence is objectionable not because it has too little probative value but because it has too much—it could overpersuade a jury to convict a defendant merely because the jury feels that the defendant is a bad person who deserves to be punished. *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998). However, other-crimes evidence may be admitted, in the discretion of the trial court, when such evidence is relevant for any other material purpose, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, *modus operandi*, or the existence of a common plan or design. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Pikes*, 2013 IL 115171, ¶ 11; see also Michael H. Graham, Graham's Handbook of Illinois Evidence § 404.5, at 241-71 (10th ed. 2010); 2 John H. Wigmore, Evidence in Trials at Common Law §§ 301 to 307 (Chadbourn rev. 1979). When evidence of other crimes is offered, the trial court must weigh the probative value of the evidence against the prejudicial effect and should exclude the evidence, even if the evidence is relevant, if the prejudicial effect substantially outweighs the probative value. *Pikes*, 2013 IL 115171, ¶ 11; *Manning*, 182 Ill. 2d at 214; Ill. R. Evid. 403 (eff. Jan. 1, 2011). The erroneous

admission of other-crimes evidence carries a high risk of prejudice and will ordinarily require a reversal. *People v. Cortes*, 181 Ill. 2d 249, 285 (1998). Nevertheless, for a reversal to be warranted, the erroneously admitted evidence must have been a material factor in the defendant's conviction, such that without the erroneously admitted evidence, the verdict likely would have been different. *Id.* If the error was unlikely to have influenced the jury, the erroneous admission of other-crimes evidence will not warrant reversal. *Id.*

¶ 32    Having reviewed the record in the present case and the law on this issue, we find that the trial court did not commit an abuse of discretion in admitting the other-crimes evidence as some evidence of defendant's intent to deliver the cocaine in the instant case. See *Pikes*, 2013 IL 115171, ¶ 12; *Illgen*, 145 Ill. 2d at 364; *Leona W.*, 228 Ill. 2d at 460; *Donoho*, 204 Ill. 2d at 182. We reach that conclusion for three reasons. First, contrary to defendant's assertion on appeal, the other-crimes evidence had substantial probative value. One of the offenses that defendant was charged with in the instant case was possession of a controlled substance with intent to deliver. Intent to deliver, therefore, was an element of the offense, and the State was required to prove that element beyond a reasonable doubt. See *People v. Phillips*, 215 Ill. 2d 554, 574 (2005). As is often the case where a defendant's intent has to be proven, the evidence of defendant's intent to deliver as to the current charge was entirely circumstantial. See *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 14 (recognizing that circumstantial evidence is often the only way to prove a defendant's intent to commit a theft or other crime). The other-crimes evidence was a highly probative piece of circumstantial evidence on that issue. Although defendant claims that the probative value of the other-crimes evidence was lacking in this case because he was not contesting intent to deliver, defendant did not stipulate or concede that issue in front of the jury. See *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 49; *People v. Wilson*, 214 Ill. 2d 127, 138 (2005) ("[a] defendant may not use ambiguity by denying commission of the act that comprises the offense, thereby seeking to bar other-crimes evidence, while at the same time leaving room to argue lack of intent to the jury"); *People v. Davis*, 248 Ill. App. 3d 886, 892 (1993) ("[a]lthough a defendant cannot foreclose the prosecution from producing evidence of intent or motive through other crimes evidence simply by not presenting evidence or argument regarding intent or motive, the trial court may consider whether the defendant is making an issue of intent or motive when deciding whether to admit other crimes evidence"). Furthermore, while it is true that several of the common indications of drug delivery were present in the instant case, the trial court was faced with the difficult decision of having to determine in advance how much evidence of intent to deliver was enough—and not too much—for the State to present. We will not find in hindsight—and with the benefit of now knowing exactly what would be presented at defendant's trial—that the trial court's determination in that regard constituted an abuse of discretion under the circumstances of the present case. See *Illgen*, 145 Ill. 2d at 371 (stating that a reviewing court may not simply substitute its judgment for that of the trial court on a matter within the trial court's discretion).

¶ 33    Second, as we noted in our prior decision in *Watkins*, other-crimes evidence, such as prior drug sales, may be admitted in a drug case involving delivery or possession with intent to deliver as proof of defendant's intent or for any other relevant and permissible purpose. *Watkins*, 2015 IL App (3d) 120882, ¶ 46. Indeed, the Illinois Rules of Evidence specifically allow other-crimes evidence to be admitted for the purpose of showing intent (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)), and Illinois courts have routinely allowed other-crimes evidence to be admitted for that purpose or for any other relevant and permissible nonpropensity purpose

- 11 -

in drug cases involving delivery or possession with intent to deliver (see *Watkins*, 2015 IL App (3d) 120882, ¶ 46 (collecting cases)). The facts of *Watkins* and of *People v. Moser*, 356 Ill. App. 3d 900 (2005), are very similar to the facts of the present case. In both of those cases, the appellate court found that the other-crimes evidence was properly admitted. See *Watkins*, 2015 IL App (3d) 120882, ¶¶ 46-50 (in a case in which the defendant was charged with unlawful possession of a controlled substance with intent to deliver for cocaine that was found in the common area of a residence where defendant was staying after a search warrant was executed at the residence, this court found that the trial court properly admitted evidence of the defendant's prior conviction for unlawful possession of cannabis with intent to deliver as some evidence of defendant's intent to deliver the substance in the current case); *Moser*, 356 Ill. App. 3d at 913 (in a case in which the defendant was charged with unlawful possession of a controlled substance with intent to deliver for cocaine that was found in a nightstand and under the bed in the master bedroom where the defendant's wife was located during the execution of a search warrant at the residence, the appellate court found that the testimony that the police informant had purchased cocaine from the defendant approximately 15 times was properly admitted to show that defendant knowingly possessed the cocaine inside the residence).

¶ 34    Third and finally, under the circumstances of the present case, we are unable to conclude that the trial court's determination—that the probative value of the other-crimes evidence was not substantially outweighed by the prejudicial effect—was erroneous under an abuse of discretion standard of review. See *Illgen*, 145 Ill. 2d at 375 (applying an abuse of discretion standard of review to the trial court's determination of whether the probative value of other-crimes evidence is substantially outweighed by its prejudicial effect); see also Ill. R. Evid. 403 (eff. Jan. 1, 2011) (stating that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). Nor do we find anything in the trial court's ruling or in the manner in which the trial court made its decision that would suggest that the trial court's ruling was arbitrary, fanciful, or unreasonable. See *Leona W.*, 228 Ill. 2d at 460; *Donoho*, 204 Ill. 2d at 182.

¶ 35    To the contrary, the record shows that the trial court carefully considered this matter and extensively questioned the parties during the hearing on the State's motion *in limine* to make sure that the court understood all of the important facts necessary for the court to make its decision. Furthermore, the trial court carefully exercised its discretion and allowed the State to introduce some of the evidence that it sought to admit while prohibiting the State from introducing other portions of the other-crimes evidence. The trial court also took care to minimize the prejudice to defendant by giving the jury a limiting instruction that the other-crimes evidence could only be considered for the limited purpose of showing defendant's intent and/or knowledge as to the current offense. See *Illgen*, 145 Ill. 2d at 376 (indicating that the trial court's giving of a limiting instruction regarding the jury's consideration of the other-crimes evidence limited and substantially reduced any prejudicial effect created by the admission of the other-crimes evidence). The limiting instruction was given when the evidence regarding the Tahoe was admitted and again when the trial court instructed the jury prior to deliberations. The trial court did not give a limiting instruction when Detective Garner testified because defendant had requested that an instruction not be given. Although there is some uncertainty in the record regarding the parameters of the trial court's other-crimes ruling, even if the trial court incorrectly instructed the jury that it could consider the other-crimes evidence as to both knowledge and intent, rather than as to intent only, any such possible error would

not require a reversal in this case. See *People v. Spyres*, 359 Ill. App. 3d 1108, 1113-14 (2005) (recognizing that other-crimes evidence that is admissible for one reason is not affected by the inadmissibility of that evidence for another reason and that giving an overbroad limiting instruction on other-crimes evidence does not require a reversal).

¶ 36    In addition, contrary to defendant's assertion on appeal, the evidence presented to the jury to establish that the other crimes had occurred was not extensive and was not equivalent to a mini-trial being held before the jury on the other offenses. See *People v. McKibbins*, 96 Ill. 2d 176, 186-87 (1983) (the supreme court advised against conducting a mini-trial on the prior offense at the current trial). The initial introduction of the other-crimes evidence required only one additional witness, Detective Garner, to testify for the State. Although a forensic chemist also testified as to the analysis of the drugs that Detective Garner recovered from defendant, that chemist was the same chemist who had testified for the State about the analysis of the substances that were recovered from the residence during the execution of the search warrant.

¶ 37    With regard to the evidence presented about the bags of cannabis recovered by Detective Garner, we cannot say that the State ran afoul of the trial court's ruling on the motion *in limine*. The trial court's statement about the admissibility of the cannabis is somewhat ambiguous, and we cannot determine from the record that has been presented whether defendant's or the State's interpretation of the trial court's ruling on the cannabis is correct.

¶ 38    As for the evidence on the search of the Tahoe and the substances recovered from the Tahoe, defendant cannot complain on appeal about that evidence, since it was defendant—and not the State—who first placed the search of the Tahoe before the jury. See *People v. Reeves*, 385 Ill. App. 3d 716, 731 (2008) (recognizing that a defendant cannot complain where evidence of his past misconduct was not offered to show propensity but, rather, was invited by his own trial tactics). It was permissible, therefore, for the State to present additional evidence on rebuttal to clarify the evidence defendant had placed before the jury on the police search of the Tahoe. See *id.*

¶ 39    In sum, we conclude that the trial court did not err in admitting the other-crimes evidence in this case. In reaching that conclusion, we have reviewed the two main cases cited by defendant in support of his argument to the contrary—*People v. Pitts*, 257 Ill. App. 3d 949 (1994), and *People v. Chambers*, 259 Ill. App. 3d 631 (1994)—and have found those cases to be neither factually nor legally similar to the present case. See *Pitts*, 257 Ill. App. 3d at 953 (in an aggravated criminal sexual assault and home invasion case, the appellate court found that the trial court erred in allowing the State to introduce the testimony of defendant's probation officer to establish defendant's address for the purpose of proving identity where the defendant was willing to stipulate to his address, the State already needed the defendant's building manager to testify to show that the key found at the victim's residence fit defendant's door lock, the building manager's testimony would have convincingly proved defendant's address, and the only conceivable purpose for presenting the probation officer's testimony was to advise the jury of defendant's criminal past); *Chambers*, 259 Ill. App. 3d at 634-36 (in a first degree murder case, the appellate court found that the trial court erred in allowing the State to introduce lengthy and detailed testimony from the State's insanity expert regarding defendant's prior criminal acts where that evidence had only marginal value to the crux of the disagreement between the State's and the defendant's sanity experts regarding defendant's sanity at the time of the offense). Because we find that the trial court's ruling on the admissibility of the other-crimes evidence did not constitute an abuse of discretion in this case, we affirm the trial court's

ruling on that issue. Having reached that conclusion, we need not address the State's other argument in the alternative, that any error that occurred was harmless.

¶ 40                                    B. Class X Sentencing

¶ 41    As his second point of contention on appeal, defendant argues that the trial court erred in imposing a Class X sentence on defendant under section 5-4.5-95(b) of the Unified Code. Defendant asserts as a matter of statutory interpretation that his prior 2009 DWLR conviction was not a qualifying offense under section 5-4.5-95(b) because (1) the elements of his 2009 DWLR conviction were equivalent to those of a misdemeanor offense and not a Class 2 or greater felony and (2) the legislature intended that a defendant's fifteenth or subsequent DWLR conviction would constitute a Class 2 felony only if the original underlying suspension or revocation was for one of the three enumerated offenses (leaving the scene of an accident involving death or personal injury, driving under the influence, or a statutory summary suspension) and all of the 14 prior DWLR convictions occurred while the defendant was suspended or revoked for that basis, which are not the facts of the 2009 DWLR conviction. Defendant asks, therefore, that we vacate his sentence and remand this case for a new sentencing hearing.

¶ 42    The State argues first that defendant has forfeited his claim of sentencing error by failing to raise that specific claim in his motion to reconsider sentence. As defendant correctly points out, however, a sentence that is not statutorily authorized affects a defendant's substantial rights and will generally be reviewed, despite any possible forfeiture, under the second prong of the plain error doctrine. See *People v. Mobley*, 383 Ill. App. 3d 89, 92 (2008) (the appellate court reviewed alleged error regarding possible misapplication of the law during sentencing under the second prong of the plain error doctrine because the alleged error involved a substantial right). Second, and in the alternative, the State argues that the trial court's sentencing decision was proper and should be upheld. The State disagrees with defendant's interpretation of the relevant statutes and asserts that defendant's interpretation is untenable and not supported by the case law or the legislative history. The State asks, therefore, that we affirm the trial court's sentencing decision.

¶ 43    The interpretation of a statute is a question of law that is subject to *de novo* review on appeal. *People v. Baskerville*, 2012 IL 111056, ¶ 18. The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Id.* The most reliable indicator of that intent is the plain and ordinary meaning of the language of the statute itself. *Id.* In determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting the statute. *Id.*; 5 ILCS 70/1.01 (West 2012) (in construing a statute, "[a]ll general provisions, terms, phrases and expressions shall be liberally construed in order that the true intent and meaning of the General Assembly may be fully carried out"). If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *People v. Dabbs*, 239 Ill. 2d 277, 287 (2010). A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Baskerville*, 2012 IL 111056, ¶ 18. However, if the language of a statute is ambiguous, in that it is susceptible to more than one reasonable interpretation, a court may consider extrinsic aids to determine the

meaning of the statutory language. See *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 51 (1990).

¶ 44     There are two statutes at issue in the present case—section 5-4.5-95(b) of the Unified Code and section 6-303(d-5) of the Illinois Vehicle Code (625 ILCS 5/6-303(d-5) (West 2012)). Section 5-4.5-95(b) of the Unified Code provides that:

"When a defendant, over the age of 21 years, is convicted of a Class 1 or Class 2 felony, after having twice been convicted in any state or federal court of an offense that contains the same elements as an offense now (the date the Class 1 or Class 2 felony was committed) classified in Illinois as a Class 2 or greater Class felony and those charges are separately brought and tried and arise out of different series of acts, that defendant shall be sentenced as a Class X offender. This subsection does not apply unless:

(1) the first felony was committed after February 1, 1978 (the effective date of Public Act 80-1099);

(2) the second felony was committed after conviction on the first; and

(3) the third felony was committed after conviction on the second." 730 ILCS 5/5-4.5-95(b) (West 2012).

Under section 5-4.5-95(b), Class X sentencing is mandatory—a trial court must sentence a defendant as a Class X offender if the defendant has prior qualifying felony convictions that satisfy the requirements of the statute. See *People v. Thomas*, 171 Ill. 2d 207, 222 (1996) (discussing a prior version of the statute).

¶ 45     The second statute at issue in the present case, section 6-303(d-5) of the Illinois Vehicle Code, provides that:

"Any person convicted of a fifteenth or subsequent violation of this Section is guilty of a Class 2 felony, and is not eligible for probation or conditional discharge, if the revocation or suspension was for a violation of Section 11-401 or 11-501 of this Code, or a similar out-of-state offense, or a similar provision of a local ordinance, or a statutory summary suspension or revocation under Section 11-501.1 of this Code." 625 ILCS 5/6-303(d-5) (West 2012).

¶ 46     When we review the two statutes and consider them in light of the competing assertions of the parties in the present case, we find that defendant's first assertion is well taken. For the issue raised in this particular case, the language of section 5-4.5-95(b) of the Unified Code is clear and unambiguous. The focus is on the elements of the prior offense. See 730 ILCS 5/5-4.5-95(b) (West 2012). To constitute a qualifying offense under the statute, the prior offense must contain the same elements as an offense now classified in Illinois as a Class 2 or greater Class felony. See *id.* Defendant's 2009 DWLR conviction in the instant case was elevated from a misdemeanor offense to a Class 2 felony based, in part, upon defendant's prior convictions for DWLR. Our supreme court has found, however, that those prior underlying convictions do not constitute elements of the offense. See *People v. Lucas*, 231 Ill. 2d 169, 180-81 (2008) (finding that the prior convictions that served as the basis for a felony DWLR conviction were sentencing enhancements and not elements of the offense). Rather, the elements of defendant's prior 2009 Class 2 felony DWLR were that defendant was driving upon a highway of this State and that when he did so, his driver's license was revoked. See *id.* at 179-81; 625 ILCS 5/6-303(a) (West 2008). Those are the elements of a misdemeanor DWLR offense. See *Lucas*, 231

Ill. 2d at 179-81. Thus, as defendant asserts, his 2009 DWLR conviction could not be used as a qualifying offense to make him eligible to be sentenced as a Class X offender under section 5-4.5-95(b) of the Unified Code.

¶ 47 Having reached that conclusion, we need not address defendant's second assertion—that his 2009 DWLR conviction should not be treated as a Class 2 felony for the purpose of the application of section 5-4.5-95(b) of the Unified Code because not all of his 14 (or more) prior DWLR convictions occurred while defendant's driver's license was suspended or revoked for a violation of one of the three enumerated statutes (leaving the scene of an accident involving a death or personal injury, DUI, or a summary suspension). We, therefore, vacate defendant's sentence and remand this case for defendant to be resentenced as a Class 1 offender. We must note, however, that while our decision here lowers the minimum prison sentence for which defendant is eligible from six years down to four years, the maximum prison sentence for which defendant is eligible would still be 30 years because defendant has a prior conviction under the Illinois Controlled Substances Act. See 730 ILCS 5/5-4.5-30(a) (West 2012) (indicating that the sentence of imprisonment for a Class 1 felony, other than second degree murder, shall be a determinate sentence of not less than 4 years and not more than 15 years); 720 ILCS 570/408(a) (West 2012) (stating that any person convicted of a second or subsequent offense under the Illinois Controlled Substances Act may be sentenced to a term of imprisonment of up to twice the maximum term otherwise authorized).

¶ 48                                     III. CONCLUSION

¶ 49 For the foregoing reasons, we affirm defendant's conviction, vacate defendant's sentence, and remand this case for the trial court to conduct a new sentencing hearing.

¶ 50 Affirmed in part and vacated in part.

¶ 51 Cause remanded.